**CARTER–WALLACE, INC., Appellee,**

v.

**RIVERTON LABORATORIES, INC., Appellant.**

**No. 43, Docket 34718.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1970.

Decided Nov. 9, 1970.

---

Zachary T. Wobensmith, 2nd, Philadelphia, Pa. (Louis C. Jones, Jones, Jenkins & Warden, Brooklyn, N. Y., and Zachary T. Wobensmith, 3rd, Philadelphia, Pa., on the brief), for appellant.

William D. Denson, New York City (Morgan, Finnegan, Durham & Pine, George B. Finnegan, Jr., and John D. Foley, New York City, on the brief), for appellee.

Before ANDERSON and FEINBERG, Circuit Judges, and WEINFELD, District Judge.[*]

ANDERSON, Circuit Judge:

This is an appeal from the district court's determination that the patent of the appellee, Carter-Wallace, Inc., for a certain pharmaceutical compound, generically known as meprobamate, was valid, and, as the appellant, Riverton Laboratories, Inc., had conceded infringement, that Carter-Wallace was entitled to injunctive relief, an accounting and damages.[1] We affirm.

United States Letters Patent No. 2,724,720 was issued on November 22, 1955 to Carter Products, Inc., predecessor of Carter-Wallace, Inc., upon the application of Dr. Frank M. Berger and Dr. Bernard J. Ludwig. The patent covers three organic compounds in the class of 2, 2-disubstituted-1, 3-propanediol dicarbamates, one of which is the compound "2-methyl-2-n-propyl-1, 3-propanediol dicarbamate," generically known as meprobamate and marketed under certain trade names, of which "Miltown" and "Equanil" are the most common. Riverton Laboratories produced and sold meprobamate under its generic name and argued that Carter-Wallace's patent encompassing meprobamate was invalid. The parties are in substantial agreement as to most of the relevant facts and dispute only the effect to be given them.

In 1949 Dr. Berger joined Carter-Wallace as director of research and began experimenting to find a compound that would have properties similar to but with a longer duration than a chemical compound, which he had discovered in 1947, known as mephenesin and used both as a tranquilizer and for the treatment of muscle spasms. Dr. Berger believed that if such a drug could be found it could have therapeutic value. In 1950 Dr. Berger's colleague, Dr. Ludwig, synthesized meprobamate; and on July 29, 1950, Drs. Berger and Ludwig filed an application for a patent on the compounds, asserting that the compounds possessed "marked anticonvulsant properties * * * possessing an action of considerable duration and intensity."

The application was rejected on February 9, 1951, on the ground, *inter alia*, that the discovery did not involve "invention" over a compound described in a

---

[*] Of the Southern District of New York, sitting by designation.

1. Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 304 F.Supp. 357 (S.D.N.Y. 1969).

prior patent. After an amendment and argument were filed on July 25, 1951 the application was again rejected on January 11, 1952, but Dr. Berger filed an affidavit on July 9, 1952 in support of a request for reconsideration in which he described tests conducted on mice to determine the anticonvulsant properties possessed by the compounds.[2] He concluded that the results conclusively demonstrated that "many of the .carbamates are distinctly better than their parent compounds * * * *" On March 12, 1953 the application was again rejected by the Patent Office because the Examiner still entertained doubts that the compounds involved invention.

On August 3, 1953 Drs. Berger and Ludwig filed a second patent application on the same chemical compounds as a continuation in part of the first application. In the specifications to the application Drs. Berger and Ludwig claimed that all three compounds possessed a marked anti-convulsant property of considerable duration and that one of the compounds, meprobamate, possessed a marked paralyzing action. The claim of anticonvulsant properties was supported by reference to tests conducted on mice and the claim of a paralyzing action by reference to pharmacological studies on unnamed animals, and the results of these tests showed that the paralyzing capability of meprobamate was superior to that of mephenesin. The patent was finally granted on November 22, 1955 after the Patent Office was satisfied that the claims in the Berger-Ludwig application did show "invention."[3]

During the period of time that the patent application was making its way through Patent Office procedures, meprobamate and the related compounds were tested on humans, and on December 9, 1954, Dr. Berger submitted a New Drug Application to the Food and Drug Administration (FDA), which was granted on April 28, 1955. The first sale of meprobamate was made on May 9, 1955, some two and one-half months prior to Carter-Wallace's receipt of the patent.

The New Drug application disclosed that in 1951 tests of meprobamate were conducted on mice, dogs, rabbits and cats and that beginning in May 1952, clinical tests on humans were conducted. The tests on animals apparently followed a routine method of evaluating new chemical compounds for potential use. The district court fully described the procedures in its opinion and it is unnecessary to repeat that description, except to state that the basic purposes of the tests are to determine the effective dose and the lethal dose of the chemical compound. Once these dosages are determined, tests on humans may begin. These are conducted in three stages with three different objectives: the first is to determine lack of toxicity, tolerance and safety; the second is to establish clinical effectiveness through repeated usage; and the third is to determine the addictive qualities of the drug. The only factual issue challenged on appeal relates to the stage at which the clinical tests had arrived by August 3, 1953, the date on which the applicants filed the continuation in part application. Al-

2. The affidavit described a series of electroshock tests conducted on mice injected with measured dosages. United States Patent Application No. 176764.

3. The Patent Office originally rejected the continuation in part application for failure to show invention. Dr. Berger filed an amendment to the application accompanied by his affidavit in which he supplied some inadvertent omissions from the test data contained in the application which tended to show that, with regard to the properties in question, the present compounds were superior to their parent compounds. He further described new tests that were conducted on mice, comparing the present compounds with those described in an earlier patent and concluding that the present compounds were superior in desired effect. On July 15, 1955, Dr. Berger filed a supplemental argument accompanied by his affidavit to answer certain questions of the Examiner as to whether the present compounds had been described in an article published in a scientific journal.

though the appellant claims that the tests had reached stage two or stage three by January, 1953, the trial court found that at the time of the filing of the continuation in part application, clinical tests had reached only stage one. Substantial evidence exists to support this finding, and there is no reason for this court to disturb it.

Riverton Laboratories makes a three pronged attack on the judgment below: (1) that the patent applications failed to disclose sufficient utility to satisfy the statutory requirement of utility, 35 U. S.C. § 101, as interpreted by the Supreme Court in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966); (2) that by failing to disclose to the Patent Office that the patentees intended the drug primarily for the treatment of humans and that clinical tests had been and were being conducted on humans, the patentees did not comply with the statutory requirement that the patentees disclose the best mode contemplated by the inventor for carrying out his invention, 35 U.S.C. § 112; and (3) that by failing to disclose to the Patent Office that the patentees intended that the drug be used primarily for the treatment of humans and that clinical tests on humans had been and were being conducted, the patentees committed a fraud on the Patent Office. For these reasons, the appellant claims that Carter-Wallace forfeited its right to the protection of the patent laws and urges that the judgment below be reversed.

What are now presented as three distinct claims have developed through gradual distillation from Riverton Laboratories' single, broadly stated defense, in the trial court, of fraud by Carter-Wallace on the Patent Office. The discussion of the issues should, therefore, begin with the broader issues of fraud and disclosure of the best mode, and conclude with the utility requirements as expounded in *Manson*.

Although at the trial, Riverton Laboratories based its claims of fraud on a number of grounds, including Carter-Wallace's alleged false representations as to the beneficial effects of meprobamate, on appeal Riverton Laboratories' claims rest solely on Carter-Wallace's failure to reveal to the Patent Office the results of its tests on humans.

Fraud in the procurement of a patent is a defense to an action for infringement. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). While this concept of fraud clearly encompasses making a false representation of fact in the application or supporting affidavits (Id.), there is little or no substantiation in the present case for the charge that the patentees made misrepresentations to the Patent Office. The court below specifically found that all representations made by the patentees were made in good faith with no intent to deceive, and the appellant does not seriously challenge this finding. Appellant argues, however, that the defense of fraud also encompasses instances in which the inventor has failed to disclose information which he was under an obligation to reveal, such as the results of Carter-Wallace's clinical tests on humans or similar matters "grounded on the confidential relation of the inventor with the Patent Office [and in the] statutory obligation to 'set forth the best mode contemplated by the inventor of carrying out his invention.'"

While appellant's arguments might possess merit in a case where the inventor has concealed the results of tests on humans when the Patent Office has specifically requested test material to support the claims made in the application, that is not true of the present case. Under present practice, submission of test information to the Patent Office in support of the claims made in an application is not required, unless the asserted utility of a compound is not believable on its face to persons skilled in the

art in view of the contemporary knowledge in the art.[4] There is nothing to indicate that this present practice represents a departure from the prior mode of procedure, and since no request was made that the applicants produce tests to substantiate the claims, the failure to produce the tests on humans cannot be considered a breach of the confidential relationship of the inventors with the Patent Office.[5]

█ Nor can the failure to disclose the results of the tests on humans be considered a breach of the statutory duty to disclose the best mode contemplated by the inventor for the use of the invention, as required by 35 U.S.C. § 112.[6] This calls upon the inventor to disclose enough information to enable one to make the compound for purposes of exploiting the claimed properties, and this was done here. But even if the failure to reveal a specific therapeutic use for the compound can be categorized as a "best mode" problem, we do not think that the applicants have failed to meet the obligation.

█ Although it might be a different matter were it shown that the inventor intentionally *concealed* the facts that the invention was useful in the treatment of humans and that he intended to use it solely for their treatment, no such showing was made in this case. It is undisputed that prior to the patent being issued on November 22, 1955, the tests on humans had been satisfactorily completed, demonstrating that the drug had a therapeutic use for humans, but the critical date with regard to disclosing the best mode contemplated is the date of the filing of the application. Benger Laboratories, Ltd. v. R. K. Laros Co., 209 F.Supp. 639 (E.D.Pa.1962), aff'd 317 F.2d 455 (3 Cir.) cert. den. 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963). Assuming for this purpose that the date of filing the continuation in part application, August 3, 1953, is the appropriate date, the district court specifically found that as of that date the clinical tests had not progressed sufficiently to justify any claim as to the efficacy of meprobamate in the treatment of humans. That this finding is supported by the evidence is not subject to serious dispute. We hold, therefore, that under the circumstances of this case, neither the confidential relation between the inventor and the Patent Office nor the statutory requirement that the inventor disclose the best mode contemplated by him for the use of the invention required a disclosure by him of the results of the tests on humans.

█ The appellant contends that the inventor was, for a third reason, under a duty to reveal the human-test results, and that is the statutory utility requirement of 35 U.S.C. § 101.

> "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,
> \* \* \*."

The construction of this section as applied to patents on chemical compounds and processes was considered by the Supreme Court in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). The appellant argues that *Man-*

---

4. Guidelines for Considering Disclosures of Utility in Drug Cases, 849 Official Gazette of the United States Patent Office No. 3 (United States Department of Commerce April 16, 1968).

5. Certain requests were made by the Patent Office, but they related to proof that the present compounds constituted "invention" over prior compounds. See note 3, *supra.*

6. 35 U.S.C. § 112, the pertinent portion of which reads:
 "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

son stands for the proposition that when an inventor seeks a patent on a chemical compound intended for therapeutic use, he must produce evidence of tests on humans sufficient to establish the safety of the drug for human use. The Supreme Court opinion, however, neither expressly nor by implication makes any such statement. *Manson* was concerned with an interference proceeding in which the Patent Office had denied a patent because the application showed no practical use for the compound produced by the claimed new chemical process, and the applicant, therefore, failed to establish a prima facie case for patentability. Although the applicant produced authority to show "that steroids of a class which included the compound in question were undergoing screening for possible tumor-inhibiting effects in mice and that a homologue adjacent to Manson's steroid had proven effective in that role," there was nothing to show that Manson's steroid had accomplished this or was even likely to do so. The Court of Customs and Patent Appeals reversed, holding that where a known product is produced by a claimed process it is not necessary to show utility for the product so long as it is not detrimental to the public interest. The Supreme Court rejected this standard and sustained the position of the Patent Office. It also rejected the claims that a chemical process is useful because it produces the intended product even though that product has no known use and that a chemical process is useful because it produces a compound belonging to a class which is the subject of serious scientific investigation. The Court in its opinion expressly refrained, however, from ruling upon the "patentability of a process whose sole demonstrated utility is to yield a product shown to inhibit the growth of tumors in laboratory animals." 383 U.S. at 531, note 17, 86 S. Ct. at 1040.

The appellant in the present case relates its claims regarding the compound meprobamate to therapeutic use for human beings.[7] But the trial court found that at the time of the filing of the continuation in part application Carter-Wallace's experimentation, looking toward possible human use for the compound, was in such an early stage and so tentative and indeterminate that the feasibility of such use was unknown. The trial court also rejected the charge of fraud in connection with Carter-Wallace's non-disclosure of what experimentation it had made. We have found no reason to set aside these findings and conclusion of the court below. As the case now stands it presents the question whether or not a new chemical compound which has therapeutic effect on standard laboratory animals has utility for the purpose of the statute. The appellant would have this court dismiss the whole matter as frivolous.

The Supreme Court left this question undecided in *Manson* but prior to that decision the Court of Customs and Patent Appeals held that the statutory requirement of utility is satisfied where the inventor reveals a novel compound with therapeutic properties whose utility

---

7. Appellant also asserts that in rejecting, as a standard of "utility," the proposition that something is useful unless it is alleged to be detrimental to the public interest (383 U.S. at 530–531, 86 S.Ct. 1033), the Court established as an implicit requirement for patentability that the Patent Office make a specific finding that drugs intended for human treatment be safe for that use. Certainly, however, logic does not compel the conclusion that, by rejecting the claim that everything is useful unless shown to be detrimental, the Court adopted the test that nothing is useful unless shown to be safe. Moreover, we find nothing in the suggested test itself to commend it. Not only is "safety" no more easily applied than "utility" (Cf. Brenner v. Manson, 383 U.S. 519, 533, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1965)), but we agree with the trial court that to require the Patent Office to make an affirmative finding as to the safety of a drug for human use would work a serious overlapping of the respective jurisdictions of the Patent Office and the Food and Drug Administration, whose responsibility is stated in 21 U.S.C. § 355(b)–(e).

has been demonstrated through tests on standard experimental animals.

> "We hold as we do because it is our firm conviction that one who has taught the public that a compound exhibits some desirable pharmaceutical property in a standard experimental animal has made a significant and useful contribution to the art, even though it may eventually appear that the compound is without value in the treatment of humans." [8] Application of Krimmel, 292 F.2d 948, 953, 48 C CPA 1116 (1961).

See also Application of Hitchings, 342 F.2d 80, 52 CCPA 1141 (1965); Application of Dodson, 292 F.2d 943, 48 CCPA 1125 (1961). In general, we are in accord with this position and are of the opinion that the line drawn by the majority of the Supreme Court in *Manson* should not be extended to include cases like the one before us.

 There remains the consideration of whether or not meprobamate has the essentials to qualify for patentability. The experiments with it were made with mice which are standard for laboratory experimentation. There was evidence that experiments were also made with some other unnamed animals. The results showed it had utility as an anticonvulsant and afforded resistance to electroshock seizures. It may be noted that the Guidelines for Considering Disclosures of Utility in Drug Cases, note 4, *supra*, provides that a showing of operativeness of the compound for use on standard test animals is adequate for test purposes as to animal utility in general.

As to its therapeutic character, its ability to serve as an anticonvulsant, to treat muscle spasms, to paralyze the voluntary muscles and act as a tranquilizer plainly qualify it. The therapeutic property of a compound is its ability to heal or cure, in whole or significant part, a disorder in a human being or in any form of plant or animal life. The Patent Office was extremely careful and deliberate in reaching its decision of patentability in this case and there is nothing in the record to suggest that it was not fully substantiated.

We hold, therefore, that Carter-Wallace possesses a valid patent on the compound in question, having satisfied the statutory requirement of utility found in 35 U.S.C. § 101 by claiming properties of therapeutic value that were adequately demonstrated through tests on standard experimental animals. No fraud was committed on the Patent Office in not revealing the results of incomplete human testing, and there was no failure on the part of the inventor to reveal the best mode contemplated by him for the use of the invention. Appellant's other contentions have been considered, but we hold them to be without merit.

The judgment of the district court is affirmed.

---

8. Although the Court of Customs and Patent Appeals has not had the opportunity to express itself directly on this issue since *Manson*, it has ruled on the effect of *Manson* on the utility requirement with regard to the related area of the patentability of chemical compounds whose only use is as an intermediate in the production of other compounds. See Application of Kirk, 376 F.2d 936 (C.C.P.A.1967); Application of Joly, 376 F.2d 906 (C.C. P.A.1967). These decisions are not inconsistent with the position that *Manson* did not affect the holding in Application of Krimmel. This is the viewpoint apparently held by the Patent Office. See Guidelines for Considering Disclosures of Utility in Drug Cases, *supra*, note 4, which, *inter alia*, provides:

> "Proof of utility under this section may be established by clinical or in vivo or in vitro data, or combinations of these, which would be convincing to those skilled in the art. * * * If there is no assertion of human utility, or if there is an assertion of animal utility, operativeness for use on standard test animals is adequate for test purposes."