**J. Allan CAMPBELL and John C. Babcock, Appellants,**

**v.**

**Albert WETTSTEIN et al.**

**Patent Appeal No. 8805.**

United States Court of Customs and Patent Appeals,

April 5, 1973.

---

3. Affirmed 336 F.2d 1022, 54 CCPA 733 (1966).

Sidney W. Russell, Arlington, Va., John Kekich, Kalamazoo, Mich., attys. of record, for appellants.

Joseph G. Kolodny, Summit, N. J., atty. of record, for appellee. Wender-

oth, Lind & Ponack, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to Wettstein et al. (hereinafter Wettstein), the senior party, as to four counts relating to certain 7α–lower alkyl–19–nor androstene steroid compounds.

Wettstein is involved on his patent No. 3,301,879, issued January 31, 1967, on application serial No. 324,854, filed November 19, 1963, which the board held entitled to the January 25, 1963, convention priority date of a corresponding Swiss application for constructive reduction to practice of the interference subject matter.

Campbell et al. (hereinafter Campbell) are involved on application serial No. 446,395, filed April 7, 1965.[1]

The board found, as the basis of its decision, that certain biological evaluation tests performed by Campbell's witnesses "are insufficient to establish an actual reduction to practice of the invention of the counts." We disagree, and reverse the decision of the board.

*The Subject Matter*

The counts which correspond to claims 1–4 of the Wettstein patent, read as follows:

1. A 19-nor-androstene of the formula in which R1 and R3 each repre-

1. Campbell's application is assigned to the Upjohn Co. and the Wettstein patent is assigned to Ciba Corp., now Ciba-Geigy Corp.

sent a member selected from the group consisting of a free, an esterified and an etherified hydroxyl group, $R_2$ represents a lower alkyl group and $R_4$ stands for a member selected from the group consisting of hydrogen, lower alkenyl, lower alkinyl, halogenated lower alkenyl and halogenated lower alkinyl, and $R_3$ and $R_4$ taken together represent oxygen, the above esterified hydroxyl groups being derived from carboxylic acids having at most 20 carbon atoms and said ether groups being members selected from the group consisting of hydrocarbon and halogenated hydrocarbon except for the ether oxygen linkages.

2. $\Delta^4$–3:17$\beta$ – dihydroxy – 7$\alpha$ – methyl – 17$\alpha$ – ethinyl – 19 – nor – androstene.

3. $\Delta^4$–3:17$\beta$ – diacetoxy – 7$\alpha$ – methyl – 17$\alpha$ – ethinyl – 19 – nor – androstene.

4. $\Delta^4$–3:17 – dihydroxy – 7$\alpha$ – methyl–19–nor–androstene.

According to the Wettstein patent specification, the above 19–nor–androstene compounds

\* \* \* possess valuable pharmacological properties. Inter alia they display in test animals anabolic-androgenic activity with a particularly high ratio of the anabolic to the androgenic effect. This enables them to be used as anabolic agents. A particularly high anabolic action is found in those compounds of the Formula 1 [same as in count 1, supra] in which $R_1$ and $R_3$ each represents a free or esterified hydroxyl group, $R_4$ a hydrogen atom or a methyl or ethyl group and $R_2$ stands for a methyl group. Moreover, the compounds, and especially those which have an unsaturated hydrocarbon radical in 17$\alpha$ position, those for instance in which $R_4$ is an ethinyl group, have antigonadotropic, gestagenic and anti-hypercholesterinemic action.

Other than general disclosure that the new androstenes "may be used as medicaments \* \* \* in the form of pharmaceutical preparations" in various specific dosage units and forms "suitable for enteral or parenteral administration," as well as three examples relating to preparation of certain dosage forms, the Wettstein patent contains nothing further relating to the usefulness of the claimed compounds.

Campbell's specification contains similar disclosure. It observes that compounds including those within the scope of the counts

\* \* \* have anabolic and androgenic activity of improved therapeutic ratio of the former versus the latter. They also exhibit improved solubility properties in oil vehicles, e. g., sesame oil, cotton-seed oil and like substances for intramuscular injection, thus permitting more effective doses of steroid to be administered in a practical volume of oil and thereby prolonging the duration of biological effect. They also possess anti-fertility, anti-androgenic and anti-estrogenic activities. They also have the ability to reduce the level of cholesterol in the blood and consequently are of therapeutic value in the treatment or prevention of atherosclerosis. The foregoing properties make the new compounds useful in medical and veterinary practice.

The compounds of the invention can be prepared and administered to mammals, birds, humans, and animals, in a wide variety of oral or parenteral dosage forms \* \* \*.

### The Evidence

Campbell has taken testimony and introduced documentary evidence, both relating primarily to activities during the period July 1962 to February 1963, to establish actual reduction to practice of four steroid compounds identified as compound A (count 4 and a species of Count 1), compound B (count 2 and a species of count 1), compound C (a species of count 1) and compound D (count 3 and a species of count 1). The docu-

mentary exhibits relating to each of those compounds are correlated with them by identical capital letter designations. Wettstein was not represented at the taking of depositions of Campbell's witnesses so there was no cross-examination, nor did he adduce any rebuttal evidence. No question has been raised by either the board or Wettstein with respect to Campbell's corroborated proofs that, prior to January 25, 1963, Wettstein's earliest date, Campbell conceived, actually prepared, and identified the four compounds above-mentioned. The controversy revolves around the legal adequacy of certain biological tests to which the above compounds were subjected to determine their usefulness as an anti-fertility agent. To that evidentiary matter we now turn.

The record establishes that Campbell, working under the direction of his co-inventor, Babcock, synthesized compounds A, B, and C in the summer of 1962 and compound D in mid-January of 1963.

Shortly after synthesis and isolation of the compounds, he submitted them to Upjohn's Biological Screening Office and requested that they be tested, inter alia, for anti-fertility activity. Standardized biological evaluation request forms were used for that purpose. The anti-fertility screen and assay was carried out by Lyster, a research associate of nearly 25 years experience in the Biological Screening Office, and his assistant, Cornette. Lyster testified that the test procedure applied by him was one designed to show the property of anti-fertility, and had been described in a 1961 journal publication which he had co-authored and which is in evidence as Exhibit P, Supplement No. 1.[2] The results of the tests were recorded on certain pages of Lyster's notebook, copies of which are in evidence as Exhibits A1–6, B1–6, C1–6, and D1–6. Subsequently, the test results were formally reported by Lyster to various Upjohn research personnel on standardized

---

2. That journal article describes the procedure as follows:

The compounds were administered orally to mature Sprague-Dawley female rats in single daily doses from the day prior to insemination for a total of seven days. On the ninth day of the test the rats were sacrificed and their uteri examined for implantation sites. The "MED$_{100}$" was considered the lowest dose at which no implantation sites were observed.

In discussing procedure followed by him with respect to Compound D, Cornette confirmed the above modus operandi:

Q–15 Will you now look at Exhibit D1–6 and tell me what that is, if you know.

A It is the same type of record as we were talking about before, where compounds were set up, injected between these dated 1/21 and 1/27, animals were autopsied on 1/29 and pregnancies were determined at that time.

Interestingly, an affidavit of record filed during the prosecution of the Wettstein application establishes that Ciba personnel followed similar experimental procedure in determining anti-fertility activity of certain steroids, one of which corresponds to Compound D. We quote from the affidavit:

6. Determination of inhibitory activity on blastocyst implantation by the following procedure:

Adult female rats were fertilised (fertilisation being confirmed by the presence of spermatozoa in the vaginal smear) and treated for 7 days as from the following day. Autopsy was performed one day after the completion of treatment, and both uterine horns were then examined for nidated blastocysts.

The results are presented in Table VI. Inhibition of blastocyst implantation in 75% of the animals treated is produced by 3 mg./kg./day s. c. [subcutaneously] of $\Delta^4$ - 3,17$\beta$ - diacetoxy - 17$\alpha$ - ethinyl - 19 - nor - androstene, and by approximately [sic] 10 mg./kg./day p. o. [orally]. The same response is obtained with 0.3 mg./kg./day of 7$\alpha$ - methly - $\Delta^4$ - 3,17$\beta$ - diacetoxy - 17$\alpha$ - ethinyl - 19 - nor - androstene subcutaneously or orally.

These results show that 7$\alpha$ - methyl - $\Delta^4$ - 3,17$\beta$ - diacetoxy - 17$\alpha$ - ethinyl - 19 - nor - androstene is 10 times more potent than $\Delta^4$ - 3,17$\beta$ - diacetoxy - 17$\alpha$ - ethinyl - 19 - nor - androstene subcutaneously and about 30 times more potent orally.

forms, copies of which comprise record Exhibits A1–5a, B1–5a, C1–5a and 5b, and D1–5a. Those exhibits bear dates of September 4, 1962; August 20, 1962; August 20, 1962; and February 19, 1963, respectively. The notebook pages and Lyster's reports show on their face that each of compounds A, B, C, and D inhibited pregnancy of the subject animals at several dosage levels. Referring to the reports and results summarized therein, Lyster testified that each of compounds A, B, C, and D possessed "significant anti-fertility activity." Other recipients of the reports circulated by Lyster—in particular, Campbell and Dr. Shepherd (head of the Biological Screening Office at the time the tests were conducted)—testified in substance that the reports were relied on by Upjohn research personnel for the truth and accuracy of the results reported therein, and that they also were of the opinion, based on the reports, that compounds A, B, C, and D were "very active," or had "interesting" to "highly interesting" or a "high order of" activity, as anti-fertility agents.

## The Decision of the Board

The board agreed with the evaluation by Wettstein of the screening test data in the Campbell record, that it "represents no more than an initial test to determine (along with other tests and toxicity data) whether or not additional work should be done, leading to a reduction to practice." In according "little weight" to those tests, it further noted that the tests include "no toxicity data at all, nor the presence of controls," and that "meager amounts" of the four compounds were employed. With respect to the testing of compound A, the board observed that Lyster testified that he administered the compound to the test animals by subcutaneous injection, whereas the method in the publication Lyster referred to as disclosing the procedure he followed "was confined to oral administration"; consequently, said the board, "we cannot give much weight to Lyster's testimony that the compound in

question had anti-fertility properties." Finally, having earlier noted that no witness for Campbell nor any documentary evidence offered by him had shown what significance "a biological screen is to a person skilled in the art relating to compounds contemplated for use as pharmaceuticals or therapeutics," the board took judicial notice of portions of three publications relating generally to screening tests conducted by pharmacology laboratories in further support of its conclusion that "the screening tests for anti-fertility performed by Lyster or persons under his supervision are insufficient to establish an actual reduction to practice of the invention of the counts * * *."

In response to Campbell's request for reconsideration, the board concluded that the three publications above referred to "are in the nature of opinion evidence introduced for the first time by us in our decision," that the part of its decision relying on them "was in error," and that its decision should be modified to the extent that it "be read with the exclusion of any reference to" those publications. It otherwise adhered to its award of priority to Wettstein.

## OPINION

We see no serious contention on the part of the board or by Wettstein that clinical testing in humans, approval by the Food and Drug Administration, or commercial usefulness is necessary for a reduction to practice of the present invention. Cf. In re Hartop, 311 F.2d 249, 50 CCPA 780 (1962); In re Anthony, 414 F.2d 1383, 56 CCPA 1443 (1969). Having been granted a patent on the basis of his disclosure of usefulness in "test animals," Wettstein is not in a favorable position to argue that Campbell must show tests on human beings in order to prove an actual reduction to practice. Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957). Moreover, the interference counts contain no limitation relating to intended use or to discovered properties of the claimed compounds. Accordingly, under

well-established precedent, evidence establishing substantial utility for any purpose is sufficient to show reduction to practice. Archer v. Papa, 265 F.2d 954, 46 CCPA 835 (1957); Blicke v. Treves, supra. Although Campbell's assignee's ultimate purpose undoubtedly is the treatment of humans, successful testing and use in standard laboratory animals is adequate for a reduction to practice of the compounds under the guidelines of Archer v. Papa and Blicke v. Treves, supra. See also In re Krimmel, 292 F.2d 948, 48 CCPA 1116 (1961); In re Bergel, 292 F.2d 955, 48 CCPA 1102 (1961), and In re Hitchings, 342 F.2d 80, 52 CCPA 1141 (1965).

The board's main criticism of Campbell's biological test data—and Wettstein's principal criticism too—is that those animal tests are of such a preliminary, tentative nature that "other tests," along with further "toxicity data," are necessary before anti-fertility activity can be reasonably ascertained and an actual reduction to practice occurs. The board did not explain what "other tests" it would require in the present circumstances, and the record[3] does not make it clear what further tests, if any, should be required. We find no substantial evidence of record to support the board's conclusion that further tests are necessary. Indeed, the preponderance of the evidence appears to be to the contrary.

There is considerable uncontradicted and credible testimony of Campbell and his witnesses that, based on Lyster's tests, they were satisfied compounds A, B, C, and D had useful anti-fertility properties. It cannot be gainsaid that each of those compounds was *effective* in preventing fetus implants in the uteri of rats at appropriate dosage levels. That they were relatively *safe* in their effectiveness for that purpose, at least to the point of not producing death by reason of acute toxicity in the test animals,[4] is also apparent. Campbell has demonstrated by a preponderance of the evidence that the compounds, when administered to a standard experimental animal, possess the significant property of preventing pregnancy—the intended purpose—and were tolerated by the animals during the test periods. We think that is enough. As stated in In re Krimmel, supra,

\* \* \* we hold that when an applicant for a patent has alleged in his patent application that a new and unobvious chemical compound exhibits some useful pharmaceutical property and when this property has been established by statistically significant tests with "standard experimental animals," sufficient statutory utility for the compounds has been presented. \* \* \*

We hold as we do because it is our firm conviction that one who has taught the public that a compound exhibits some desirable pharmaceutical property in a standard experimental animal has made a significant and useful contribution to the art, even though it may eventually appear that the compound is without value in the treatment of humans.

See also Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 433 F.2d 1034 (2d Cir. 1970). We see nothing of record to establish that Lyster's tests are per se insufficient or that a battery of additional tests, including further toxicity

3. The three, rather general publications of which the board originally took judicial notice to support its position contain no reference to the signifiance or appropriate scope of screening procedure in the anti-fertility field. The board correctly held, we think, that those materials were not properly part of the record or subject to judicial notice, and properly excluded any reference to them in accordance with its decision on reconsideration.

4. As Campbell has pointed out in his brief, administration of the compounds to the test animals produced no demonstrable symptoms of toxicity over the one-week period and they were tolerated by the animals at dosages of four to 20 times the minimum effective dose for inhibiting pregnancy.

tests, are needed before one can properly conclude that the compounds possess useful anti-fertility activity in test animals.

Apparently recognizing the deficiency of his case, and in a further attempt to "provide evidence" that several other types of anti-fertility and toxicity tests *are necessary* in order to adequately determine the propriety of an initial conclusion as to a compound's activity and the desirability of extended study of it, Wettstein urges us "to consider, even if by judicial notice," the content of several additional publications not of record which are appended to his brief. The purpose of the publications, says Wettstein, is to make this court aware "of what is meant by assays and screens in anti-fertility research * * *."

The propositions sought to be established by reference to the controverted publications are, we think, matters to be established by appropriate record evidence and are not matters to be resolved by reliance on judicial notice. Wettstein had the opportunity, if he wished to do so, to challenge the credibility and conclusions of the Campbell witnesses by way of cross-examination, rebuttal testimony of his own, or timely introduction of documents. He did not avail himself of those opportunities. It is now too late to accomplish by indirection what he could have done directly. We decline to take judicial notice of those publications. Martin v. Snyder, 214 F.2d 177, 41 CCPA 1010 (1954); In re Cofer, 354 F.2d 664, 53 CCPA 830 (1966).

The board and Wettstein have assigned additional reasons for according Lyster's tests "little weight": (1) "meager amounts" of the four compounds

were employed, and (2) the tests included no "controls," i. e., animals to which *no* active compound was administered.

The board's comments regarding the small amount of each compound used by Lyster vis-à-vis the total amount of each compound submitted by Campbell for use in testing no doubt are derived from the calculations it independently made as to the amount utilized. As Campbell points out in his brief, those calculations are in error on the low side by a factor of 21, the board having calculated merely one aminal's dosage for one day and having overlooked the. fact that the tests were carried out in triplicate over a period of seven days. The board did not explain why the use of less than the total amount of compound submitted for testing should unfavorably affect its view as to the weight to which the tests are entitled. We regard the surplus of each compound remaining after conclusion of the tests as irrelevant.

Nor do we attribute any overriding significance to the fact that the tests as carried out by Lyster may not have included control animals to which *no* test compound was administered.[5] It is apparent from the documentary exhibits relating to each compound that larger doses of compound successfully inhibited pregnancy in some groups of animals, while sufficiently small doses were partially or totally unsuccessful in preventing pregnancy in other groups of animals. We agree with Campbell that in this kind of testing the appearance of pregnancy in the latter groups of animals corresponds, in effect, to the result achieved by the presence of a control.

Finally, as one further reason for not according "much weight" to Campbell's evidence that compound A possessed

---

5. Actually, Lyster was asked on direct examination, and replied affirmatively, whether he now reaffirmed statements he had made in an affidavit earlier filed under Rule 204(c), in evidence as Exhibit G–Supplement 1. There he averred that, prior to November 23, 1962, pregnancy was prevented in rats to which certain amounts of compounds A, B, and C in sterile water containing 0.25% methyl cellulose had been administered, whereas "he observed pregnancy in all of the rats treated with *only* sterile water containing 0.25% methylcellulose." [Emphasis in original.] There is no documentary evidence in Exhibits A, B, or C which supports that testimony relating to the use of only the sterile water-methyl cellulose material.

anti-fertility properties, the board noted that the compound was administered to the test animals subcutaneously rather than orally as set forth in the published procedure allegedly followed. We are at a loss to understand why the board thought that the route of administration would make any crucial difference in showing the anti-fertility property. Indeed, the record shows that compound C was administered to test aminals both subcutaneously and orally, with the result that pregnancy was inhibited in both instances at effective dosage levels. Then, too, the affidavit filed during the prosecution of the Wettstein application (footnote 2, supra), evidences similar results with respect to compound D. In the absence of any record evidence that the route of administration is significant or critical for purposes of determining activity—and neither the board nor Wettstein has directed our attention to such evidence—we give no effect to that supposed variance from published experimental procedure in ascertaining the weight otherwise to be accorded the evidence.

In conclusion, and according the evidence on behalf of Campbell the weight to which we think it is entitled, we hold that Campbell has established by the requisite preponderance of the evidence an actual reduction to practice of compounds A, B, C, and D.

As a consequence of its conclusion that none of the biological tests performed by Lyster was adequate to establish an *actual* reduction to practice, the board also considered whether Campbell had shown—in addition to his acknowledged prior conception—reasonable diligence from a time prior to January 25, 1963, the date of Wettstein's conception, to his own *constructive* reduction to practice on April 7, 1965. Inasmuch as we have found that Campbell completed actual reduction to practice of com-

pounds A, B, and C (counts 1, 2, and 4) prior to January 25, 1963, there is no need to discuss diligence with respect to them. As to compound D, since we have found that Campbell conceived compound D on January 14, 1963, and had actually reduced it to practice by January 31, 1963, when he knew the results of the anti-fertility tests on compound D—long before his April 7, 1965, constructive reduction to practice but shortly after Wettstein's January 25, 1963, date of conception—it becomes necessary to decide only whether Campbell was reasonably diligent from a time prior to January 25, 1963, to his January 31, 1963, date of actual reduction to practice, a period considerably shorter than that considered by the board.[6]

We have no difficulty in determining that there was reasonable diligence with respect to compound D during that period. The record shows that Campbell synthesized compound D on January 14, 1963; that he submitted it for anti-fertility testing and structure analysis on January 16 and 17, 1963; that he received various analytical reports confirming his proposed structure on January 18–21, 1963; that Lyster and Cornette submitted compound D to the anti-fertility assay earlier described on January 21, 1963; that said assay requires approximately nine days to complete; that on completion of said assay the experimental animals underwent autopsy on January 29, 1963, at which time the compound was found to prevent implants at several dosage levels; that Campbell favorably compared the anti-fertility assay activity of compound D with other related steroids, including the commercial steroid "Norlutin," in a confidential monthly summary report dated January 31, 1963, to his superior, Dr. Hogg; and that Hogg testified that he was informed of the results obtained by Campbell at least as early as February

6. The board did not find fault with activities on behalf of Campbell during the period January 14, 1963, to February 19, 1963, but found "no evidence relative to *continuous activity directed specifically*

*to the compounds of the counts,* from a time after February 19, 1963 up to April 7, 1965, the filing date of the involved Campbell application." [Original emphasis.]

21, 1963, as shown by his signature appearing on Campbell's report as of that date. We think those activities constitute reasonable diligence during the critical period beginning prior to January 25, 1963, and nothing Wettstein has argued persuades us to the contrary.

### Taxation of Costs

One matter remains, relating to taxation of costs. We have found that 20% of certain papers which appellee Wettstein asked to be included in the transcript of record are unnecessary for a fair understanding and consideration of the issue presented by Campbell's reasons of appeal. Accordingly, the cost of printing such material is assessed against Wettstein, with the cost of printing the remaining 80% to be assessed against Campbell.

The decision is reversed.

Reversed.