Gerald **REY–BELLET** and Hans Spiegelberg, Appellants,

v.

Edward L. **ENGELHARDT**,
Appellee,

v.

Walter **SCHINDLER**, Appellee.

Edward L. **ENGELHARDT**,
Appellant,

v.

Gerald **REY–BELLET** and Hans Spiegelberg, Appellees,

v.

Walter **SCHINDLER**, Appellee.

Patent Appeal Nos. 8998, 8999.

United States Court of Customs and Patent Appeals.

April 4, 1974.

Rehearing Denied June 27, 1974.

Carroll G. Harper, New York City (Fitzpatrick, Cella, Harper & Scinto, New York City) attorneys of record for appellant Engelhardt.

William H. Vogt, III, New York City, attorney of record, for Rey-Bellet. Samuel L. Welt, Jon S. Saxe, Bernard S. Leon, William G. Isgro, Nutley, N. J., and Stevan J. Bosses, New York City, of counsel.

John T. Miller, Washington, D. C., (Wenderoth, Lind & Ponack, Washington, D. C.,) attorney of record, Joseph G. Kolodny, Summit, N. J., for Schindler. Karl F. Jorda, Ardsley, N. Y., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

These appeals are from the decision of the Patent Office Board of Patent Interferences awarding priority of invention of the sole count in issue to Schindler, the senior party of this three party interference.[1] We reverse the board's decision and hold that priority should have been awarded to the party Engelhardt.

*The Appeals*

Schindler is involved in these appeals on application serial No. 282,874, filed May 24, 1963, as a continuation-in-part of application serial No. 179,482, filed March 13, 1962. Schindler claimed and

1. The interference involved in the board's decision is a consolidation of two interferences and originally there were five parties. Two of these suffered adverse decisions in earlier Patent Office proceedings and are no longer parties to the interference.

was accorded the benefit under 35 U.S. C. § 119 of two Swiss applications. The earliest of these, Swiss No. 3054/61, had a filing date of March 14, 1961. This date became his date of invention for the purpose of the interference contest conducted below.

Appeal No. 8998 is the appeal of the party Rey-Bellet et al. (Rey-Bellet) involved on application serial No. 463,345, filed June 11, 1965, as a continuation-in-part of application serial No. 170,787, filed February 2, 1962. Rey-Bellet claimed and was accorded the benefit of two earlier Swiss applications, the earliest of which, Swiss No. 11,063/61, had a filing date of September 22, 1961. Rey-Bellet also claimed the benefit of an even earlier Swiss application, Swiss No. 1467/61, filed February 8, 1961. However, the board held that this application failed to satisfy the requirements of the first paragraph of 35 U.S.C. § 112 and could not, therefore, be the basis of a claim for priority purposes made under § 119. Accordingly, Rey-Bellet was restricted to the September 22, 1961, filing date of Swiss No. 11,063/61 for a date of invention.

Appeal No. 8999 is the appeal of the party Engelhardt involved in serial No. 297,710, filed July 25, 1963. Engelhardt was accorded the benefit of an earlier filed U.S. application, serial No. 120,835, filed May 24, 1961, but alleged an even earlier conception and actual reduction to practice. In the alternative, Engelhardt alleged diligence between the conception and the 1961 filing date. However, the board held these allegations not to have been proven and restricted Engelhardt to the May 24, 1961, filing for date of invention.

Having concluded that neither Rey-Bellet nor Engelhardt had proven dates of invention earlier than March 14, 1961, the board awarded priority to Schindler.

### The Subject Matter

The sole count of this interference is directed to a chemical compound and reads as follows:

5–(3-methylaminopropylidene) dibenzo–[a, d]–cyclohepta [1, 4] diene.

The parties to these appeals refer to this compound by a less cumbersome name, nortriptyline, which is usually abbreviated to NTL. Nortriptyline (hereinafter NTL) is an antidepressant compound at moderate dosage levels, but acts as a tranquilizer at higher dosage levels. It has the following chemical structure:

$$CH-CH_2-CH_2-N\begin{matrix} CH_3 \\ CH_3 \end{matrix}$$

### OPINION

From the posture of the parties to these appeals, Engelhardt would legally be entitled to priority over Schindler in either of two circumstances. He can prove either that he made an actual reduction to practice of the invention before March 14, 1961, the unchallenged date of invention accorded Schindler by the board, or that he conceived the invention before that date and was diligent from a point in time before that date to a subsequent actual or constructive reduction to practice. In fact, Engelhardt argues that he has satisfied his burden of proof relative to either circumstance, although he principally relies on the allegation that he completed an actual reduction to practice prior to Schindler's date of invention.

### The Alleged Actual Reductions to Practice

It is undisputed that the compound corresponding to the count had been prepared in this country by Engelhardt no later than December of 1960, while employed at the Merck, Sharp and Dohme Research Laboratories (Merck). Accordingly, all that remained for an ac-

tual reduction to practice was the establishment of a practical utility. See, e. g., Anderson v. Natta, 480 F.2d 1392 (Cust. & Pat.App., 1973) and Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957). Since the count contains no limitation related to any utility, evidence which would establish a substantial utility for any purpose is sufficient to show its reduction to practice. Campbell v. Wettstein, 476 F.2d 642 (CCPA 1973).

Engelhardt urges that the satisfaction of these legal tests can be found in the results of each of three tests carried out at Merck on laboratory animals. All of these tests were made at Merck by personnel other than the inventor.

The earliest of these tests, the Mental Health General Screening Test, was accomplished in December of 1960. This test is carried out by administering a candidate drug to mice intraperitoneally at differing dosage levels. This test is not designed to detect any specific property of a drug. Instead a number of physical responses of the test animal to the drug are observed. These responses, and for that matter the absence of a response, can be indicative of the presence or absence of a desirable pharmacological property in the drug. The test also gives an indication of the toxicity of the drug.

The second of these tests is known at Merck as the Tetrabenazine Antagonism Test. Again, the test animals are mice. In this test the candidate drug is first administered to the animal followed by a later administration of tetrabenazine. Tetrabenazine is a tranquilizer.

The purpose of the test is to screen candidate drugs for antidepressant activity. The detection of antidepressant activity in a drug using test animals is particularly difficult since the animal is not depressed. The role of tetrabenazine is to chemically simulate depression in the mouse through its tranquilizing effect. To the extent that the candidate drug offsets the tranquilizing effect of tetrabenazine it is said to be an "antagonist" of this effect. Typically a suc-

cessful test is indicated when the test animal remains active after the sequential administration of the "antagonist" and tetrabenazine. NTL was screened using this test on March 10 and March 29, 1961.

At the time this test was used on NTL at Merck, it was newly developed. However, a similar test using a different drug to simulate depression was under investigation at the National Institutes of Health.

The third test, a so called Sidman Avoidance Test, was made on March 14, 1961. The purpose of this test is to screen drugs for tranquilizing activity. The test animals are squirrel monkeys. The test is carried out by placing the monkey in a cage having a grid floor which is wired to produce a shock every eight seconds. The monkey is trained to avoid shock by pressing a lever which delays the shock for 48 seconds. The average monkey has a high rate of avoidance of shock. However, if the monkey is tranquilized he becomes indifferent to the consequences of being shocked and more likely to fail to press the lever. Therefore, the potential effect of a drug as a tranquilizer is measured by the performance of a test animal in avoiding shock before and after administration of the drug.

Despite positive indications from these tests that NTL possesses pharmacological activity, the board was of the opinion that the results of the tests did not establish a reduction to practice for the reason that they failed to prove that the compound had any particular utility. Specifically, the board felt that the tests did not demonstrate that NTL would exhibit antidepressant or tranquilizing activity in man. As additional support for its holding that the tests were not adequate to prove a reduction to practice, the board concluded that the record did not reveal any conviction of success at Merck regarding the outcome of these tests being sufficient to show that NTL would be an antidepressant or tranquilizer.

In his attempt to show error in the board's decision, Engelhardt has directed our attention to a number of decisions of this court in which the results of tests done on laboratory animals were considered to be adequate to prove a reduction to practice. We view these cases as falling into two categories.

One category includes those cases in which the tests, though carried out on animals, were considered to prove that the drug would be useful in human therapy. This situation arises when there exists a satisfactory correlation between the effect on the animal and that ultimately observed in human beings. See, e. g., Engelhardt v. Judd, 360 F.2d 408, 54 CCPA 865 (1966).

The other category is made up of those cases in which the tests done on animals, even though they might have been designed to indicate a utility for human therapy, prove that the drug is useful for treating animals. See, e. g., Campbell v. Wettstein, supra; Blicke v. Treves, supra; In re Hitchings, 342 F. 2d 80, 52 CCPA 1141 (1965); In re Krimmel, 292 F.2d 948, 48 CCPA 1116 (1961); and Archer v. Papa, 265 F.2d 954, 46 CCPA 835 (1957).

■ We have considered the character of Engelhardt's evidence as it is embodied in the three tests described above. In our view it fails to establish a reduction to practice within either category of cases for reasons set forth more fully below.

Engelhardt considers the Mental Health General Screening Test as adequate to prove a reduction to practice in two ways. One allegation made is that this test proves NTL has anticholinergic activity because its administration caused the pupils of the eyes of the test animals to dilate. However, the record simply does not support this contention. One of his own witnesses testified that drugs other than those having anticholinergic activity can cause pupil dilation. Therefore, the test cannot be regarded as being specific for this property.

Another allegation made by Engelhardt is based on the structural similarity between NTL and a drug known as amitriptyline,[2] known to be an antidepressant when NTL was made. According to the testimony of one of Engelhardt's witnesses, the results on the screening test for these two drugs were similar. However, it seems clear from the record that this test is unsuited for detecting antidepressant, tranquilizing and anticholinergic activity, the only useful properties possessed by amitriptyline. Therefore, we cannot conclude that the similarity between the two in the screening test is adequate to prove that NTL has any of the aforementioned properties.

The results of the tetrabenazine antagonism test are also inadequate to prove a reduction to practice as an antidepressant. As indicated above, the test was newly developed in 1961. Therefore, the test cannot be regarded as having been an adequate predicator of antidepressant activity in human beings because at the time the test was run there was insufficient experience with it to show the necessary correlation between tetrabenazine antagonism in mice and antidepressant activity in man.

The tetrabenazine antagonism test also fails as an indicator that NTL would be useful in animal therapy. In the first place it has not been established that the property of tetrabenazine

2. Amitriptyline has the following formula:

It differs from NTL by having two $CH_3$-substitutes on the nitrogen atom (N) rather than one. Amitriptyline has slight tranquilizing and anticholinergic activity.

antagonism is per se useful. Secondly, the record established that mice are not depressed, hence the need for chemical simulation of depression using a tranquilizer. Therefore, NTL cannot be regarded as being useful for alleviating depression in animals.

We have also concluded that the Sidman Avoidance Tests run with NTL fail to prove a substantial utility for the drug as a tranquilizer. From the record it appears that NTL demonstrated only weak tranquilizing activity in squirrel monkeys as indicated by their reduced ability to avoid shock. In our view, such a poor showing by NTL in this test cannot be regarded as proof that tranquilizing activity would be observed in man.

We also note that the record reveals that very large doses of NTL were required to cause the tranquilizing effect in monkeys. This makes the results suspect if for no other reason than it suggests correspondingly large doses would be required to affect a human subject if any effect at all could be observed. At such doses the possibility that harmful side effects would occur, which would negate any tranquilizing properties, becomes very much enhanced.

With regard to animal therapy, we need only observe that the record is devoid of any indication that the ability to tranquilize monkeys, particularly the very slight ability shown for NTL, is a property having substantial utility.

### The Alleged Conception

In the board's opinion, Engelhardt failed to prove that he had conceived the invention prior to May 24, 1961, the filing date of the U.S. patent application, the benefit of which was accorded Engelhardt for priority purposes. The board felt this was justified notwithstanding the fact that Engelhardt had actually made the compound in this country no later than December of 1960. In its view, Engelhardt failed because he had not proven that he had conceived a particular utility for NTL or the

means by which one skilled in the art could reduce to practice this utility without exercising more than routine skill.

In the board's view then, even when the invention is a chemical compound which has been made and is defined by a count reciting no limitation related to its use, conception of that invention is not complete absent a conception of its utility. Engelhardt does not challenge this interpretation of the law. Accordingly, we will treat it as the law of this case although in our minds its applicability remains very much an open question. However, any resolution of this issue should be deferred until squarely presented and briefed by the parties to an appeal.

On the basis of the evidence in the record, we are persuaded that Engelhardt conceived that NTL could be useful as an antidepressant no later than January of 1961. Furthermore, we also believe that no more than routine skill in the art was necessary to reduce this utility to practice.

In its opinion, the board acknowledged Engelhardt's testimony to the effect that he had conceived that NTL would be useful as an antidepressant but dismissed it as lacking corroboration. It also rejected several documentary exhibits as failing to establish conception of this utility. Engelhardt argues that if individually these documents and other evidentiary elements of his case do not establish that he conceived a utility, then collectively they do. We agree.

The gist of the testimony given by Engelhardt is that he felt NTL would have antidepressant activity because of its structural similarity to amitriptyline. It is pointed out above that amitriptyline was known to possess antidepressant activity at the time of the alleged conception by Engelhardt. This testimony, if corroborated, would establish conception by him that NTL could be used as an antidepressant.

The earliest exhibit pertinent to the question of Engelhardt's conception is

Exhibit 9, entitled "Delivery Sheet" and dated December 14, 1960. It is a printed form which, in effect, is a request that tests be conducted on a given compound. Exhibit 9 sets forth the structure of NTL and contains the following notations:

Dr. Stone for screening in the mental health program.

Dr. Hanson for behavioral testing in comparison with "Elavil".

It is pertinent to note that "Elavil" is Merck's trademark for amitriptyline.

The board felt that Exhibit 9 failed as a conception because it did not specifically mention antidepressant activity and for the further reason that:

In our opinion, this falls short of being evidence of conception for the reason that the above instructions to Dr. Stone and Dr. Hanson do not furnish the means to enable one skilled in the art to use the compound for a particular purpose so that nothing remains but routine skill for effectuation of said use.

Another exhibit relied upon by Engelhardt, Exhibit 106, is a handwritten sheet entitled "Compounds for 'Elavil' Program—Clinical." Sixteen compounds were included in the list. All but NTL have been blocked out. That list was read by Dr. James Sprague, Director of Medicinal Chemistry at Merck. In his own hand he added, among other things, the following notation dated January 14, 1961, to the structure of NTL:

Cf. MAO–I + Tofranil

In his brief, Engelhardt alleges that MAO–I stands for monoamine oxidose inhibitors also known to be antidepressants. However, that is not clearly established in the record and we will disregard it. Nevertheless, the record does reveal that "Tofranil" was a well known antidepressant at the time of Engelhardt's alleged conception.

We view these two exhibits as corroborating that Engelhardt had conceived that NTL would have antidepressant activity because of its similarity to amitriptyline. The most significant property of amitriptyline was its antidepressant activity. Structurally it is very similar to NTL and the profiles of the two compounds in the Mental Health Screening Test were very similar. Furthermore, the record does not reveal any other substantial property other than antidepressant activity for which one would seek to compare NTL to amitriptyline.

The testimony of Dr. V. G. Vernier, a supervisor at Merck for the drug screening program, supports this conclusion. He testified that he and Dr. Engelhardt discussed the potential of NTL after he (Dr. Vernier) received Exhibit 9 in December of 1960. He recalled that Engelhardt indicated to him that he expected NTL to have antidepressant activity because of its similarity to amitriptyline.

Schindler, citing Alpert v. Slatin, 305 F.2d 891, 49 CCPA 1343 (1962), a case also relied upon by the board, argues that these exhibits and this testimony indicate at most a *hope* that NTL would possess antidepressant activity and as such falls short of being an inventive conception. In *Alpert*, this court adopted a portion of the board's opinion as its own. A pertinent extract from that portion reads as follows:

Conception of an inventive process involves proof of mental possession of the steps of an operative process and, if necessary, of means to carry it out to such a degree that nothing remains but routine skill for effectuation thereof. If after the claimed conception date *extensive research* was found necessary before achieving minimum satisfactory performance obviously the mental embodiment of that date was a mere hope or expectation, a statement of a problem, but not an inventive conception. Alpert Exh. 4 was followed by *extensive research characterized by perplexing intricate difficulties* arising every step of the way and accordingly Alpert Exh. 4 is held not to constitute evidence of con-

ception of the invention of the count. [Emphasis added.]

 That which determines if the mental formulation of the invention rises to the level of conception is whether or not the inventor has also conceived the means of putting that formulation in the hands of the public where no more than routine skill would be required to do so. In this case we think the proof that Engelhardt had conceived of NTL as an antidepressant is sufficient to complete the conception of utility because it appears that nothing beyond the exercise of routine skill would have been required to demonstrate that it had this activity. It is true that extensive testing on animals was done at Merck and that actual clinical trials on humans were not conducted until after the filing date of Engelhardt's parent application. However, the extent of testing or other research done after the mental formulation of an invention is not a reliable indicator that the "perplexing intricate difficulties" referred to in *Alpert* have been encountered. A more reliable criterion is the nature of this research.

In this case the record establishes that the tests done at Merck on NTL using test animals were those routinely done to a drug before it is administered to humans. No "perplexing intricate difficulties" had to be overcome. Probably such preliminary testing could have been eliminated in favor of direct testing on humans which would have quickly established whether NTL was an antidepressant. However, the unpredictable response that a human subject might exhibit dictates that considerable preliminary testing in animals be done in order that as much information as possible be known about a drug before it is tested in man. Although in this case the testing done was not sufficient to establish

an actual reduction to practice, the policy of conducting such testing is to be applauded rather than penalized.

### The Alleged Diligence to a Constructive Reduction to Practice

The adequacy of Engelhardt's parent application as a constructive reduction to practice is not challenged. Therefore, there remains for consideration but one question in Engelhardt's case, that being whether there was diligence from a time before the dates of invention alleged by or accorded to his opponents to the filing date of his parent application. On this point, the board declined to consider whether there was diligence up to March 29, 1961, the date of the last test relied upon by Engelhardt to establish an actual reduction to practice.

The board did hold that there was no evidence of activity between April 21, 1961, the date of an exhibit reporting the results of a Tetrabenazine Antagonism Test, and May 12, 1961, the date of the first draft of the parent application. We believe the record supports the conclusion that there was reasonable diligence during the contested period.

That the activity of those engaged in the preparation of a patent application accrues to the benefit of the inventor for the purpose of showing diligence requires no citation of authority. The responsibility for drafting Engelhardt's application fell to an attorney, Mr. Underwood, in Merck's patent department. He informally requested that Dr. Frank A. Cutler, technical advisor to the patent department, assist him in the preparation of this application. It was Dr. Cutler who prepared the preliminary draft of May 12, 1961.[3]

Dr. Cutler was given on, or shortly after, April 24, 1961, a number of docu-

---

3. The record indicates that Dr. Cutler prepared two drafts. The second of these was completed on May 15, 1961. Apparently neither could be regarded as a draft of a complete application. Instead they appear to have been descriptions of experimental work appearing in the disclosure of invention. The rest of the specification was prepared by Mr. Underwood.

ments containing descriptions of experiments which he was ultimately to incorporate in the draft of Engelhardt's application. Dr. Cutler testified that he was putting the finishing touches on that draft on May 12, 1961, and would have been working on it before then. This is supported by the fact that several of the documents used by him in preparing the draft contain notations in his own hand.

During the contested time period, it appears that Dr. Cutler, in addition to other duties, was also working on at least one other patent application related to that relied upon by Engelhardt for priority purposes. This application was directed to a process for preparing amitriptyline and closely related compounds including NTL. He testified that he worked on this application concurrently with Engelhardt's application because both were similar in scope and required the same starting materials. The record establishes that Dr. Cutler was working on the process application at least as late as April 27, 1961. Work on related applications can be relied upon to show reasonable diligence. Rines v. Morgan, 250 F.2d 365, 45 CCPA 743 (1957).

In view of Cutler's activity on the related process case and his testimony that he was working on the draft of Engelhardt's application prior to May 12, 1961, it is our view that there was reasonable diligence during the contest period, a time span of but 21 days.

As we noted above, the board declined to consider whether there was diligence during the period before March 29, 1961. For this time period, both Schindler and Rey-Bellet argue that the only activity which should accrue to Engelhardt's benefit for the purpose of showing diligence running to a constructive reduction to practice is activity *directly* related to preparing and filing the patent application involved here. Under their view, none of the tests should be

considered relevant to whether there was diligence, since all that was required after conception to complete the constructive reduction to practice was preparation and filing of the application.

The view urged upon us by Schindler and Rey-Bellet was rejected by this court in Keizer v. Bradley, 270 F.2d 396, 47 CCPA 709 (1959). Bradley had been awarded priority based on prior conception and diligence to a constructive reduction to practice. On appeal, Keizer argued that engineering activity directed to an actual reduction to practice could not excuse a lack of "attorney diligence" in preparation of the parent application. On this point, at 270 F.2d 400, 47 CCPA 714, the court observed:

> As long as Bradley was, as we have found, diligent in working actually to reduce his invention to practice, he was not under an obligation to file a patent application. The fact that he decided to do so does not change the situation.

The arguments of Schindler and Rey-Bellet have not persuaded us that our earlier decision should be reversed. Accordingly, we will consider all of Engelhardt's activities directed to an actual reduction to practice in order to determine if there was diligence. We think the record establishes that there was reasonable diligence from conception to the constructive reduction to practice.

Engelhardt was a chemist whose major responsibility was the synthesis of compounds which were regarded as being of potential interest to Merck. The responsibility for testing these compounds in order to determine whether they had pharmacological activity fell to other persons. The record establishes that Engelhardt requested in December of 1960 that behavioral testing be done for NTL. Such testing would include the Sidman Avoidance Test, but not the Tetrabenazine Antagonism Test which had not been developed at that time. The actual screening of NTL in the Sid-

man Avoidance Test did not occur until March 14, 1961. However, the record does not suggest that this was an extraordinary delay.

It appears that Merck's success with amitriptyline and other drugs which affect the central nervous system led to a program in which literally hundreds of compounds were being screened. As a part of this program, the Sidman Avoidance Test had begun to be used in late 1960 and was available when Engelhardt made his request.

Dr. H. M. Hanson, a pharmacologist at Merck, who was in charge of the Sidman Avoidance Test program, testified on cross-examination that they had but limited facilities in 1961 because of a shortage of monkeys and a limited ability to house them. As a result of this, the test was not often performed.

In the meantime, Dr. Vernier had developed the Tetrabenazine Antagonism Test during February 1961. As soon as Dr. Engelhardt heard of this test, he requested that NTL be employed in it. As we noted supra, this was done on March 10, 1961, and this test gave results which were better than those exhibited by amitriptyline. This test was followed on March 14, 1961, by the Sidman Avoidance Test and on March 29, 1961 by a follow up Tetrabenazine Antagonism Test.

We think this activity establishes that Engelhardt was energetically striving to reduce his invention to practice and was reasonably diligent in this pursuit.

Inasmuch as we hold that Engelhardt conceived the invention no later than January of 1961 and was diligent to a constructive reduction to practice, we need not further consider the appeal of Rey-Bellet, as the earliest date of invention alleged by him is February 8, 1961.

For the foregoing reasons, the board should have awarded priority of invention to Engelhardt. Accordingly, the decision of the board awarding priority of invention to Schindler is reversed.

Reversed.