Arthur W. ANDERSON and Gelu S. Stamatoff, Appellants,

v.

Giulio NATTA et al., Appellees,

v.

Karl ZIEGLER et al., Appellees.

Giulio NATTA et al., Appellants,

v.

Arthur W. ANDERSON and Gelu S. Stamatoff, Appellees,

v.

Karl ZIEGLER et al., Appellees.

Karl ZIEGLER et al., Appellants,

v.

Arthur W. ANDERSON and Gelu S. Stamatoff, Appellees,

v.

Giulio NATTA et al., Appellees.

Patent Appeal Nos. 8818–8820.

United States Court of Customs and Patent Appeals.

July 19, 1973.

Rehearing Denied Oct. 11, 1973.

Roger A. Hines, Wilmington, Del., attorney of record for Anderson and Stamatoff. James T. Corle, Wilmington, Del., Gerald A. Hapka, Washington, D. C., A. Newton Huff, Wilmington, Del., of counsel.

Morgan Finnegan Durham & Pine, New York City, attorneys of record for Natta, Pino & Mazzanti. George B. Finnegan, Jr., Ralph M. Watson, David H. Pfeffer, New York City, of counsel.

Arnold Sprung, New York City, attorney of record for Ziegler, Martin, Breil and Holzkamp. Nathaniel D. Kramer, Frank Murphy, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

LANE, Judge.

These appeals are from the decision of the Board of Patent Interferences, adhered to on reconsideration, awarding priority of invention of the sole count in issue to none of the three parties involved. This three-party interference was declared on January 12, 1965. Each party took testimony and submitted exhibits. Indeed, the transcript of record before this court consumes almost 4400 pages spanning five volumes. We have considered that record, which includes the decisions of the board, and the arguments advanced by each of the parties, and for reasons set forth herein, we reverse the board's decision and hold that priority of invention should have been awarded to the party Natta et al. (Natta).

## THE APPEALS

Appeal No. 8818 is the appeal of the party Anderson et al. (Anderson) involved on application Serial No. 632,416 filed January 4, 1957, as a continuation-in-part of application Serial No. 568,707 filed March 1, 1956. Anderson was accorded the benefit of the latter filing date, but alleged earlier dates of conception and actual reductions to practice. The board held the alleged dates not to be proved and restricted Anderson to the March 1, 1956, filing date for date of invention.

Appeal No. 8819 is the appeal of Natta involved on application Serial No. 710,840 filed January 24, 1958, as a division of application Serial No. 514,097 filed June 8, 1955. Natta was restricted to the June 8, 1955, filing date for date of invention.

Appeal No. 8820 is the appeal of the party Ziegler et al. (Ziegler) involved on application Serial No. 514,068 (hereafter the Ziegler U.S. application) filed June 8, 1955. Ziegler claimed the benefit of the August 3, 1954, filing date of a West German priority application (hereafter the Ziegler German application) under 35 U.S.C. § 119, but the board held that the German application is insufficient in its disclosure of how to use the subject matter of the count and accordingly restricted Ziegler to the June 8, 1955, filing date for date of invention.

Having determined that Anderson had proved no date earlier than March 1, 1956, and that both Natta and Ziegler were entitled to the same date of June 8, 1955, the board in effect held that there was no first inventor of the subject matter of the count and made no award of priority. In the words of the board, priority was "awarded against" each party.

## THE SUBJECT MATTER

The count of this interference reads as follows:

A process which comprises interpolymerizing ethylene with another hydrocarbon having one terminal–CH $=$ $CH_2$ group and no other non-aromatic unsaturation, said other hydrocarbon having at least 4 carbon atoms per molecule, in the presence of a coordination catalyst, one component of which contains a Ti-Cl bond.

The copolymerization process defined in the count is catalyzed by a multi-component composition, termed a "coordination" catalyst, containing a transition element compound and a reducing compound. The transition element compound specified in the count must contain a Ti-Cl bond and may be titanium tetrachloride ($TiCl_4$). The reducing component of the coordination catalyst may be a metal hydride or an organometallic compound such as a metal alkyl.

The products of the process of the count are ethylenealpha olefin copolymers. The olefin comonomer, which may be, for example, styrene, butene-1 or dodecene-1, imparts various properties to the ethylene component and renders the copolymer more suitable for a variety of uses than polyethylene. Depending on the comonomer and the process conditions, ethylene copolymers apparently suitable for extrusion into film or pipe or as wire coatings or for injection molding into diverse shaped articles can be produced.

## THE CASE FOR ANDERSON

It is contended that in 1954 researchers working under Anderson and Stamatoff, as well in one instance as Stamatoff himself, prepared ethylene-olefin copolymers using a coordination catalyst in which one component had a Ti-Cl bond. The conception of such a catalyst and its use in olefin copolymerization is also asserted to have occurred in 1954.

Anderson principally relies on the work of Baxter, a research chemist under the supervision of Stamatoff, which is alleged to have constituted reduction to practice of the invention of the count. In May 1954, Baxter gave instructions for the reaction of styrene and ethylene in the presence of a titanium tetrachloride-phenyl magnesium bromide coordination catalyst. That reaction yielded a product which Baxter formed into a small, sample film for the purpose of infrared analysis. Anderson contends that the product was a copolymer and that it was recognized as such. Anderson also argues that the utility of the product was apparent from its ability to be fashioned into a film, which he asserts was self-supporting, tough and flexible, as well as from the known utility of polyethylene and other film-forming olefin polymers.

Anderson additionally refers to the work of researchers Schreyer, Stamatoff, Brehm, Rombach and Wheatcroft. Specific experiments by these individuals using coordination catalysts in the polymerization of olefins, which were conducted subsequent to Baxter's work in May 1954, are relied upon as separate reductions to practice. Anderson urges that the totality of the evidence makes out a convincing case of conception and actual reduction to practice on the part of Anderson prior to the June 1955 date accorded both Ziegler and Natta.

The board held that none of the experiments conducted on behalf of Anderson amounted to reduction to practice and that conception has not been proved. The recurrent deficiencies found by the board were (1) the failure to contemporaneously establish practical utility of the polymer products and (2) the failure to establish that there was contemporaneous appreciation or conviction of success with respect to the production of a copolymer or interpolymer, the intended product of the reactions and the product which results from interpolymerization as specified in the count.

■ Because we agree with the board's conclusions respecting the failure of the record to establish that the products of the runs relied upon by Anderson had practical utility, we do not consider the additional findings of the board concerning the production of a copolymer.

■ This court has held that for an invention to be completed, i. e., reduced to practice, utility must either be established or apparent. See, e. g., Blicke v. Treves, 241 F.2d 718, 44 CCPA 753 (1957). Where the invention is a process, the product of the process must have utility. See Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). The mere production of copolymers is not necessarily a sufficient utility for a process, unless the usefulness is obvious from the copolymers themselves. See Fang v. Hankins, 399 F.2d 262, 55 CCPA 1468 (1968). Where, as here, the intended use of an invention is not indicated in the count in interference, evidence establishing substantial utility for any purpose is sufficient to show reduction to practice. Campbell v. Wettstein, 476 F.2d 642 (CCPA 1973). These are the legal considerations against which the facts involved in Anderson's case for reduction to practice must be measured.

We first observe that the only specific utility asserted by Anderson for any of the products of the runs alleged to constitute reduction to practice is as a film. Although Anderson makes some general allusions to utility in the same manner as polyethylenes known at the time of experimentation, no specific utility other than film is identified. Anderson calls attention to the internal reports which

were introduced in evidence, and these documents do provide an overview of the situation in the laboratories of DuPont, Anderson's assignee, where the new coordination catalysts were being explored. It appears that at the time of the initial experimentation upon which Anderson relies in this interference, the emphasis was on proving the operability of the catalysts in polymerization. The hope seems to have been that homopolymerization and copolymerization of olefins might be more closely controlled than previously so as to be productive of polymers different from those theretofore achieved. There is only the most abstract reference to ultimate uses of polymer products probably because demonstration of the very practicality of the catalysts was the primary objective at that formative stage of investigation. Our perception of the nature of the experimentation is corroborated by the absence of any polymer product testing for specific uses. The only testing done at the critical time was in the nature of infrared analysis and density and viscosity measurement which were aimed at identifying the structure and molecular weight of the products of the polymerization runs using the new coordination catalysts. In view of these observations, we limit our discussion as to utility to the establishment of usefulness as a film.

As indicated above, Anderson considers the work of Baxter to be the first and most important activity establishing reduction to practice of the invention of the count. Anderson's contentions are that Baxter produced a tough, self-supporting, flexible film and that the practical utility of thermoplastic film was well known in the art in 1954. Anderson argues that the product of the Baxter run was chemically similar to polyethylene already known in the art, and since the Baxter product could allegedly be fashioned into a film, its use as a film in the same way as known polyethylene film would have been readily apparent to Baxter, Anderson, Stamatoff and their co-workers. Given allegedly apparent utility, there was no need, according to Anderson, for testing to establish a specific substantial utility. In addition to the product of the Baxter work, the products of the various polymerization runs made by the other workers Anderson relies upon are also said to have been capable of forming into a film and used in the manner films were known to have been used.

On the subject of the utility of the product of the Baxter work, the board held as follows:

> Neither at the time Baxter prepared the product of [his experiment] * * * *nor at any time prior to June 8, 1955,* [emphasis the board's] is there any evidence in the record relied on by Anderson to show an appreciation of a practical utility of the Baxter product; not a single physical test for utility appears in the Anderson record or is relied on in the Anderson briefs. Yet Dr. Wheatcroft, a chemist and supervisor in the Ethylene Polymer Section of the Du Pont Polychemicals Department testified * * * that the Elmendorf tear strength test, for example, was a standard test that was accepted by people in the film business. Finally, * * * we note that there is no monthly report of Du Pont in the Anderson record prior to June 8, 1955 showing the practical utility of the product obtained by Baxter.

■■ Anderson counters the board's holding with Baxter's testimony that the film he prepared for infrared analysis was, to his recollection, "self-supporting, tough, flexible" and with the arguments noted above. Accepting as a fact that, to the extent that can be determined by hand working of the film, the film had those qualities, we nevertheless conclude that in the absence of standard testing for strength, for example, a sample film could not have been assumed to be practically fit for use as a film. We are not convinced that the mere production of a sample film for purposes of infrared analysis is sufficient to establish useful-

ness in a practical sense as film. We think there is a discernible difference between a small quantity of polymer product pressed into the shape of a film for infrared scanning, a procedure which must have been standard practice with polymerization reaction products, and a film which is determined to be practically useful in applications for which thermoplastic film is suitable. The absence of any testing for structural suitability of the film provides firm support for the board's holding.

Our conclusion with respect to the Baxter work leads to agreement with the board's holdings concerning the work of the other researchers. We have reviewed the record and the arguments advanced by Anderson, but we find no error in the board's determination that in each instance of alleged reduction to practice the product had not been proved to have practical utility. The absence of any structural testing of the film, as we have noted, is sufficient basis for the board's findings. Moreover, the board properly found no utility for those reaction products · in which the researcher contemporaneously noted that the film was "brittle" or had apparently poor optical properties.

 For the reasons stated, we agree with the board's conclusion that Anderson has not proved reduction to practice prior to June 1955.

## THE CASE FOR ZIEGLER

Ziegler relied upon the German priority application filed August 3, 1954, as a constructive reduction to practice earlier than the June 8, 1955, filing date it shares with Natta. Natta urged at final hearing before the board that neither the Ziegler German application nor the Ziegler U.S. application discloses a utility for products of the process of the count and that as a result, neither application filing date could be held to be a date of constructive reduction to practice. Natta had not filed any .motion to dissolve on the basis of those contentions during the motion period. Ziegler

argued that Natta was too late in advancing those arguments at final hearing. The board held that it would consider Natta's arguments relative to the Ziegler German application but not those advanced with respect to the Ziegler U. S. application. We hold that the board erred in refusing to consider Natta's contentions with respect to the U.S. application and correctly considered those with respect to the German application.

On the issue of considering the arguments relative to the German application, the board said:

> Natta has every right to be heard on this question since the provisions of old Rule 258 certainly do not and cannot apply to questions raised by a party opponent relative to support *in an earlier filed case,* foreign or domestic, especially when Ziegler made no motion to obtain benefit of the German application before the Primary Examiner but exercised his option, permissible under the old Rules of Practice, of waiting until final hearing to urge such benefit.

With respect to the involved Ziegler U.S. application, the board said:

> Natta concedes that Rule 258 precludes consideration at final hearing of the "patentability of a claim to an opponent" if the party raising the question has not "duly presented a motion for dissolution under Rule 231 upon such ground" or unless such party "shows good reason why such a motion was not presented." Natta presented no motions during the motion period but contends that the subsequent Supreme Court decision in Brenner v. Manson, [383 U.S. 519, 148 USPQ 689 (1966),] is binding on the Patent Office and constitutes "good reason" to consider the matter at final hearing.

We do not accept the excuse for the delay offered by Natta, for the following reasons:

1. Brenner v. Manson was decided on March 21, 1966.

2. Although the motion period in the instant interference expired on September 28, 1965, the motions were not set for hearing before the Primary Examiner until May 19, 1966, see order of the Patent Interference Examiner mailed April 18, 1966, both dates *subsequent* to the Brenner v. Manson decision.

3. The filing of belated interlocutory motions, though not encouraged, is excused under certain circumstances. See section 257 of Volume II, Interference Law and Practice by Rivise and Caesar and particularly the decision of the Commissioner in Felbel v. Fox, 1907 CD 312, 130 OG 2375. The same issue raised before us could have been raided by a belated motion filed in 1966. At this late date, we cannot condone such slumber on the part of Natta.

■ Natta insists that the board should have considered the arguments relative to the U.S. application because of the profound change in the law concerning utility effected by Brenner v. Manson, which change was not fully assimilated until this court's opinion in In re Kirk, 376 F.2d 936, 54 CCPA 1119 (1967), which overruled to some extent several prior cases of this court on the strength of the *Manson* Supreme Court opinion. Ziegler argues that *Manson* did not change the law of utility insofar as the Patent Office was concerned. We think it sufficient to recognize that at the very least the *Manson* opinion was an important clarification of the law of utility which brought into focus particular considerations regarded by the Supreme Court as of paramount importance in ascertaining utility within the meaning of the statute. The decision of the Supreme Court in *Manson* was, in our opinion, good reason to excuse the failure of Natta to present a motion during the motion period. While the board correctly observed that Natta could have filed a belated motion, we do not think the failure to do that justifies refusal to hear the issue at final hearing where Rule 258 permitted consideration.

We think it not unreasonable for Natta to elect, when *Manson* appeared, to wait for final hearing and attempt to argue the "good reason" exception of Rule 258.

In asserting error on the part of the board in considering the sufficiency of the German application, Ziegler contends that cases of this court establish that a party, Natta in this instance, which fails to raise an issue of sufficiency by way of motion during the motion period, may not do so at final hearing with respect to an earlier filed application. As a fact necessary to that argument, Ziegler alleges that his own U.S. application has no greater disclosure of utility than the German application. In other words, Ziegler contends that since Natta accepted the disclosure of the U.S. application as sufficient with regard to utility, Natta was estopped to argue the insufficiency on that ground of an earlier application having at least as good disclosure as the later application. However, we have held that Natta should have been excused from failing to file any motion respecting sufficiency of the Ziegler U.S. application, and that holding undermines the application of the estoppel theory advanced by Ziegler. Moreover, we agree with the board's reasoning on this issue.

■ In light of our holdings that the board should have considered the sufficiency of both the Ziegler U.S. and German applications, we turn to the substantive question of compliance with the utility requirements of § 101 and § 112. For the reasons hereinafter set forth, we find that the board correctly denied Ziegler the benefit of the filing date of the German application, and since, as Ziegler admits, the utility disclosure of the U.S. application is no greater than that of the German application, Ziegler was not entitled to the June 8, 1955, filing date of the U.S. application.

■ Ziegler initially argues that the benefit of the filing date of a foreign application accorded under § 119 is independent of the requirements of § 112. That position has recently been rejected

by us in Kawai v. Metlesics, 480 F.2d 880 (CCPA), decided June 21, 1973. We there held that a foreign application must meet the requirements of § 112, first paragraph, in order for a later-filed U.S. application to be entitled to the filing date of the foreign application under § 119.

The board found that the only teaching in the Ziegler German specification which could suggest utility for products of the process of the count is that such products are "plastic-like" copolymers. That, the board held, is insufficient to establish any substantial specific utility. We agree. We think such a general description of the character of the polymer products would not convey to one skilled in the art any particular usefulness. Anderson's fashioning of his products into sample films went further in leading one skilled in the art to practical utility, but we have already held that to be insufficient. We accordingly find no error in the board's conclusion that "plastic-like" polymers have no apparent utility.

Ziegler contends that the polymer products described in the German application are structurally similar to polyethylene which itself was a product of known utility. However, the board rejected the premise of the argument, finding that the theretofore unknown copolymers were not necessarily similar to polyethylene and that Ziegler himself has characterized them as new and unique. We find no error in the board's holding that there is no basis for one skilled in the art to have assumed that products described in Ziegler's German specification which are from a process on which the count reads would have the same utility as previously known products.

We hold that Ziegler has no support for the count on the basis of either the U.S. application or the German application as a result of the failure of either application to disclose utility for products of a process encompassed by the count and the absence of any persuasive evidence that such utility would have been apparent.

## THE CASE FOR NATTA

At the outset of its opinion, the board pointed out that neither Ziegler nor Anderson had challenged the right of Natta to rely on the June 8, 1955, filing date of Natta's earliest-filed U.S. application. Natta was accordingly given that date as a date of constructive reduction to practice.

On this appeal, Anderson attempts to raise the issue of the sufficiency of the Natta application filed June 8, 1955. Anderson did not raise that issue at any point below, and we will not consider it for the first time on appeal.

We hold that Natta is entitled to the date of June 8, 1955, as its date of invention.

## THE AWARD OF PRIORITY

We have determined that the board was in error in according Ziegler a date of June 8, 1955, but was correct in according Natta that date and in holding Anderson not to be entitled to any earlier date. It is clear, therefore, that Natta should have been awarded priority of invention. The decision of the board awarding priority to none of the parties here involved is accordingly reversed.

Reversed.